**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CG4, LLC, dba CHEF GEOFF'S-TYSONS CORNER,
and GEOFF TRACY,                                   Case No. 1:18-cv-00360-AJT-IDD

      Plaintiffs,

v.

TRAVIS HILL, in his official capacity as the Chief
Executive Officer of the Alcoholic Beverage Control
Authority, et al.,

      Defendants.

_____

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS'

## MOTION FOR RELIEF AND MOTION FOR DISCOVERY

## INTRODUCTION

Defendants' have repackaged the "motion for abeyance" that they filed a month ago—which was denied almost in its entirety by Judge Trenga—and re-styled it as a "motion for relief," and then re-styled it again as a "motion for discovery." Once again, they accuse Plaintiffs of evading discovery obligations. Once again, their accusations are demonstrably false.

Plaintiffs have produced all responsive documents in their possession—totaling over 68,000 pages in detailed financial and sales reports. They have done so within all court-ordered deadlines and in the only format available to them—PDF. As explained below, Defendants' Requests for Production did not specify a format for production, and Plaintiffs were therefore only obligated to produce the data in the format in which it is normally kept. *See* Rule 34(b)(2)(E)(ii). PDF is that format (indeed, it is the only format Plaintiffs have access to). Defendants' motion should be denied.

Defendants are apparently disappointed that the data could not, despite Plaintiffs' efforts, be provided in the format Defendants *prefer*, "Excel or native format." But Defendants admit that Plaintiffs did not have the capacity to export past sales data in Excel at any cost. And while Plaintiffs could have paid a third party to *convert* the PDFs to Excel, this was not required and was equally available to Defendants months ago when they received the PDFs.

Defendants further admit that Plaintiffs did not have the capacity to access the raw data or offer a raw data export themselves. They contend, however, that Plaintiffs could have paid a third party to create the ability to offer a raw data export by accessing the underlying data using code. This, they say, would have satisfied Plaintiffs' obligation to provide the data in "native format." Plaintiffs were not obligated to pay third parties to produce the data in the form Defendants' prefer. *See* Rule 34(b)(2)(E)(ii); *see also AKH Co., Inc. v. Universal Underwriters Ins. Co.*, 300 F.R.D.

684, 689 (D. Kan. 2014) (defendant was not required to re-produce material it had already produced in PDF because that was the format plaintiff requested and plaintiff's later request for production in native format would be difficult given the propriety software involved). Nevertheless, Plaintiffs have actually satisfied Defendants' request for "native format."

"Native format" is the default format that programs use when generating or saving documents.[1] *See e.g., Aguilar v. Immigration & Customs Enforcement Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 353 n.4 (S.D.N.Y. 2008) ("native format" is the "default format of a file," access to which is "typically provided through the software program on which it was created"); *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 248 F.R.D. 556, 557 (N.D. Ill. 2008) ("native format" is "the way [the document] is stored and used in the normal course of business"); *see also* 8B Fed. Prac. & Proc. Civ. § 2219 (3d ed.). The program that Plaintiffs use to generate, export, and save reports of their sales data only allows them to do so in PDF. It does not allow Plaintiffs to access the "underlying data," it allows them to create reports of that data.[2] When they do so, the *only* option is to create a report in PDF.[3] Under these circumstances, PDF is "native format."

Though Defendants would like the Court to believe that Plaintiffs are hiding valuable information from Defendants,[4] they've ignored the fact that *Plaintiffs have actually turned all of*

---

[1] https://www.meridiandiscovery.com/articles/native-file-format-production-ediscovery/

[2] This was confirmed by the makers of Plaintiffs' software, Micros and its owner Oracle, who stated that the only way to access the underlying data would be to pay a third party who understands coding to essentially create the ability to export it in its raw form. *See* Boden Dec., Ex. A.

[3] PDF is also reasonably usable because it is searchable, contains all of the information Defendants' require, and Defendants are able to convert the PDF to another format if they so desire.

[4] The tacit acknowledgement underlying Defendants' motion is that they do not have, and have never had, any actual evidence supporting the challenged laws. According to their motion, they need data from Plaintiffs in a specific, preferred format to prove the laws' constitutionality. This means that they are (and have been) relying on "speculation and conjecture" to justify their

*that information over*—just not in the format Defendants prefer.  That is, if Plaintiffs were engaged in a plan to hide information from Defendants, it would be a very bad plan, because Defendants actually have all requested information in hand and could have taken steps to make use of it themselves when they received it almost two months ago—by paying a third party to convert the PDF documents to Excel or by manually entering them into another program.  At all times, Plaintiffs have acted in good faith and have turned over all of the information Defendants purportedly need to prove their claims.  Defendants' motions should be denied.

## STATEMENT OF THE FACTS

The root of this dispute is Defendants' first and only set of discovery requests, served just six weeks before the end of discovery.  *See* Docs. 21, 66-3.  In particular, the dispute concerns Request for Production No. 3, which asked for "All documents describing, reflecting, or relating to the acts alleged in this lawsuit."  Doc. 66-3 at 1.  Plaintiffs believed that this request was overbroad, unduly burdensome, and unintelligible.  And so they objected on that basis.[5]  *See Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 202 (N.D. W. Va. 2000) (a "document request is not reasonably particular if it merely requests documents 'related to a claim or defense' in the litigation"); *United Oil Co., Inc. v. Parts Associates, Inc.*, 227 F.R.D. 404, 420 (D. Md. 2005) (rejecting request for "[a]ll documents that relate or refer to the allegations in this case.").

Six days before the discovery deadline, Defendants re-wrote the request and asked for all documents relevant to certain paragraphs in the complaint.  Doc. 71-4.  As Plaintiffs later

---

restrictions on speech.  *See Edenfield v. Fane*, 507 U.S. 761, 770 (1993).  This is further evidence that the law is unconstitutional.

[5] Defendants argue that Plaintiffs were wrong to object and should have conferred first.  Plaintiffs apologize for not so conferring, but objecting to a discovery request without conferring is hardly sanctionable conduct.  It's ironic that Defendants should insist otherwise, given that they filed a motion to compel without conferring and have imposed a unilateral ban on speaking by telephone.

explained, those allegations (which claimed that Plaintiffs were unable to use speech to compete with other businesses or to attract customers) were not based on documentary evidence; they were based on the face of the law. Doc 71-1 at 6; Doc. 71 at 14-15. Plaintiffs cannot advertise their happy hour specials, they believe happy hour is a draw to their restaurant, and they therefore allege that the advertising restrictions hinder their ability to compete and draw customers based on their lawful business practices. *Id.* But they do not allege any damages or seek to prove financial harm. They make these allegations solely to underscore the harm done to their freedom of speech—the only injury they claim. Accordingly, Plaintiffs believed that no responsive documents existed to the narrowed request.

Plaintiffs also believed that Defendants' attempt to re-write their request was improper. *See Clark v. Baka*, No. 4:07-CV-00477 GTE, 2008 WL 4531708, at *6 (E.D. Ark. Oct. 9, 2008) (rejecting party's "attempt to re-write" overly broad requests to make them "less vague, less broad, and less burdensome," and ruling that such requests "need not be answered"); *Progressive Nw. Ins. Co. v. Gant*, No. 15-9267-JAR/KGG, 2017 WL 3378784, at *2 (D. Kan. Aug. 4, 2017) (refusing to "endeavor to rewrite or narrow" overly broad discovery requests "to make them appropriate" and instead, directing party to "serve revised discovery requests" and ask for "specific information that is encompassed within these categories").

A month later, after the close of discovery, Defendants emailed Plaintiffs requesting for the first time: 1) reports of hourly sales trends since January 1, 2012; 2) reports of hourly sales trends by item since January 1, 2012; 3) reports of the cost/price of items sold per hour since January 1, 2012; 4) liquor inventory reports since January 1, 2012 (daily if they exist, or as maintained); 5) reports on hourly sales by transaction since January 1, 2012; and 6) any sales, inventory, profit, or other alcohol-related reports maintained, generated, or produced. Doc. 71-1

at 7. Defendants wanted this information for all food and beverage sales (alcoholic or non-alcoholic), at all hours (not just happy hour), pertaining to Plaintiff Chef Geoff's-Tysons Corner and any restaurant that Plaintiff Tracy has a financial interest in—including restaurants he obtained a financial interest in *after* the filing of the lawsuit.

Because discovery was closed, Plaintiffs asked Defendants to explain the basis of these requests. *Id.* at 5-6. Defendants indicated that they believed that these documents should have been produced in response to RFPD 3. *Id.* at 7. Plaintiffs disagreed, and Defendants filed a motion to compel. The time between Defendants' email identifying specific documents for production and its motion to compel was 2 days. *Compare* Doc. 71-1 *and* Doc. 66.

At the hearing on Defendants' motion, Judge Davis agreed with Defendants that the late discovery requests were encompassed by the original RFPD 3. Doc. 115-2 at 21. He ordered the parties to confer and to agree to a narrowed scope of production. Doc. 74. Plaintiffs agreed to produce all responsive documents related to that narrowed scope within less than a week, and Defendants agreed to take any desired depositions within two weeks. Doc. 115-2 at 24-26. Defendants subsequently requested and were granted an extension of the summary judgment deadlines to accommodate this production. Doc. 79.

Following Judge Davis's order, Plaintiffs worked diligently to produce all responsive documents related to the Plaintiff-restaurant in Virginia, another restaurant located in D.C., and a restaurant located in Maryland (the only three restaurants even mentioned in the Complaint). They turned over these 68,000+ documents within a matter of days, requiring an incredible amount of time and effort. After the parties later agreed on the scope of production related to a fourth restaurant (also located in D.C.), Plaintiffs requested a one-week extension to turn over those documents, which was granted, and Plaintiffs complied. Docs. 86, 88. Plaintiffs produced the final

documents to Defendants just three weeks after Defendants first specifically requested the financial documents and within a week and a half of Judge Davis's order.

During this short time, Plaintiffs' counsel discovered that Plaintiffs had recently changed their point-of-sale (POS) systems and as a result had in their possession sales data for the first three restaurants going back only one year. They thus provided to Defendants 1) sales data detailing every item sold going back one year,[6] 2) monthly inventory reports going back 3 years (reports were produced bi-weekly for the periods in which the restaurants kept them as such) 3) alcohol sales trends reports as maintained, 4) monthly profit and loss statements going back 3 years, and 5) copies of all receipts going back 3 months (as far back as they are maintained)—for those three restaurants. Per an agreement with Defendants, Plaintiffs provided the same documents for the fourth restaurant, but only dating back to the date on which Mr. Tracy obtained a financial interest in it (April 2018, after the filing of the present lawsuit).

Plaintiffs provided the documents in the only format available to them: PDF. Plaintiffs believe that this production complies with the Federal Rules because RFPD 3 did not specify a format of production, and Plaintiffs were therefore only obliged to provide the data in the form that it is normally kept—which is PDF. Rule 34(b)(2)(E)(ii); *see also AKH Co., Inc.*, 300 F.R.D. at 689.

Plaintiffs also believe that it complies with Defendants' later stated preference for "Excel or native format." Native format is the default format that a program uses to create or save files. *See e.g., Aguilar*, 255 F.R.D. at 353 n.4; *Autotech Techs. Ltd. P'ship*, 248 F.R.D. at 557. As

---

[6] Defendants characterize this development as Plaintiffs "withdrawing their agreement to comply." But Plaintiffs never represented that *everything that Defendants asked for would be available.* Plaintiffs represented that they were willing to produce *everything responsive to Defendants' requests.* It's not "non-compliant" to not produce documents that Plaintiffs do not have.

Plaintiffs explained to Defendants, the software that Plaintiffs use for storing and generating reports of Plaintiffs' sales data *only* permits Plaintiffs to generate, export, or save reports in PDF. There is no other format available, and the program does not allow Plaintiffs to access the underlying data. Excel exporting was a paid service that Plaintiffs did not subscribe to and, even if they chose to subscribe to it now, the feature was not retroactive and would not allow them to export data in Excel any further back than a month under any circumstances. *See* Boden Dec., Ex. A, (e-mail with Stephanie Simmons) (Q: "Just want to confirm here; there's no way at all to export any of our past sales data (beyond one month) to excel. A: "As far I know, there is not."). Defendants do not dispute this point.

Plaintiffs acknowledge that the raw data underlying the PDF reports *exists* in a proprietary, non-Excel format as well but, as they have explained throughout, they do not have the ability to access it or to conduct a raw data export either. They can only export data in PDF. As Defendants confirm in their motion, the only way for Plaintiffs to produce the data in *any* format other than PDF would be to pay for a third party to convert the PDFs to Excel (an option equally available to Defendants now that they have the documents in hand) or to pay for a third party to access the underlying data using code and *create* the ability to export it through a custom service. *See id.*

Defendants now accuse Plaintiffs of having demonstrated a "complete disregard" for their discovery obligations. At some points they imply that Plaintiffs have not complied at all. That's plainly false. They also accuse Plaintiffs of various other improprieties, but all such accusations are rebutted by the facts.

**ARGUMENT**

## I. PLAINTIFFS HAVE FULLY COMPLIED WITH THEIR DISCOVERY OBLIGATIONS

### A. Plaintiffs Have Complied With Their Discovery Obligations Under the Federal Rules of Civil Procedure

Defendants' RFPD 3 never specified a format for production. Without such a request, Plaintiffs were only obliged to produce the documents in the form in which they are normally kept. Rule 34(b)(2)(E)(ii); *see also AKH Co., Inc.*, 300 F.R.D. at 689. Plaintiffs satisfied this obligation.

Defendants claim that Plaintiffs have not fulfilled their discovery obligations because they have not produced the document in the format that Defendants belatedly requested, (*i.e.* "Excel or native format). But Plaintiffs believe that their production in PDF complies with the request for "native format." Native format is the format that a program uses to generate or save files. *See e.g., Aguilar*, 255 F.R.D. at 353 n.4 ("native format" is the "default format of a file," access to which is "typically provided through the software program on which it was created"); *Autotech Techs. Ltd. P'ship*, 248 F.R.D. at 557 ("native format" is "the way [the document] is stored and used in the normal course of business"). The program that Plaintiffs use to store their sales data only permits them to create, save, or export data and reports in PDF.[7] Plaintiffs would have to hire an outside vendor to convert the PDF reports to Excel, or to access the underlying data and create the ability to export it in its proprietary format, if they were to produce the data in *any* format other than PDF. Defendants themselves acknowledge this fact. Plaintiffs believe that PDF therefore qualifies as "native," and that Plaintiffs are under no obligation to pay for the data to be customized

---

[7] Excel exporting is a paid service and if Plaintiffs subscribed now, it only applies prospectively and retrospectively for one month. Boden Dec., Ex. A.

to another format that Defendants prefer, but did not formally request.  Defendants remain entitled to pay their own vendor to manipulate or convert the data however they'd like.

### B.    Plaintiffs Have Complied With Judge Davis's Order

Defendants also contend that Plaintiffs' production is inadequate because Judge Davis "ordered" Plaintiffs to produce the data in "Excel or native format."  But Judge Davis never specified the format for production.  He stated that "the request for sales and pricing data is subsumed within Request for Production No. 3.  That information will be provided."  Doc. 115-2 at 21.  RFPD 3 does not specify a format for production.

The only party that mentioned "Excel" or "native format" at the hearing before Judge Davis is Defendants, who repeatedly stated that they would *like* for a raw data export or for the data to be exported in Excel, and who represented to the Court (without any actual knowledge of Plaintiffs' software) that production would be "an easy export of Excel data."  *Id.* at 5.  What Defendants prefer or believe to be true does not change the face of their request.  Their request did not specify format, and thus Plaintiffs were only obligated to produce data in the format in which it was normally kept.  As it happens, export of Excel was not "easy," indeed it was unavailable, and PDF was the *only format available to Plaintiffs* when creating the reports.  If "native" is to mean anything, it must mean the only format available to Plaintiffs.  Defendants can pay for a third party to convert the documents to Excel or manually input the data into another program of their choice, if they like.  They have not.

## II.    FOLLOWING JUDGE DAVIS'S ORDER, PLAINTIFFS ACTED SWIFTLY AND DILIGENTLY TO PRODUCE ALL RESPONSIVE DOCUMENTS

Plaintiffs initially objected to Defendants' October 31st request for financial data.  But once Judge Davis ruled on Defendants' motion to compel, Plaintiffs acted swiftly and in good faith to

produce all responsive documents in their possession. The whole dispute, from the time Defendants put Plaintiffs on specific notice that they sought six categories of financial documents (October 31st) to the time when Plaintiffs produced the final document (November 21st), lasted just three weeks. Plaintiffs were not lackadaisical in their pursuit of documents, were not negligent in their investigation, and have fulfilled their obligations consistent with the Federal Rules of Civil Procedure.

Defendants argue that Plaintiffs' inquiry and production was "belated" and "shoddy."[8] It was not belated. Prior to Defendants' October 31, 2018, email requesting the six specific categories of financial documents (from several restaurants not mentioned in the Complaint)[9], there was no way Plaintiffs could have anticipated being required to produce these documents. Plaintiffs have explained the basis of the allegations in their Complaint. Not one of them was based on these documents; they were all based on the face of the law and the injury it caused to Plaintiffs' *speech*. Six of the restaurants were not even mentioned in the Complaint, and many of them Plaintiff Tracy only obtained a financial interest in *after* the filing of the lawsuit. As soon as Defendants actually put Plaintiffs on notice that they wanted things like "reports of hourly sales trends by item since January 1, 2012," "reports of the cost/price of items sold per hour since January 1, 2012," "liquor inventory reports since January 1, 2012," etc., they acted swiftly to locate those documents and to produce them.

---

[8] They also come to false conclusions based on the documents produced in response to their third-party subpoenas. For example, Defendants fail to recognize that Counsel spoke to Oracle by phone (because such conversations did not generate documents responsive to Defendants' subpoena), and by email (because those documents fell outside of the subpoena window). *See, e.g.*, Boden Dec., Ex. E.

[9] Indeed, many restaurants were not even contemplated by the Complaint because Mr. Tracy did not acquire a financial interest in them until *after* the filing of this lawsuit.

Defendants say that Plaintiffs never "objected" to Defendants' email request that the data be produced in "Excel or native format," and they accuse Plaintiffs of not informing Defendants about Plaintiffs' inability to produce the data in Excel until after production. In fact, Plaintiffs objected to the request in its entirety and sought clarification and compromise, but Defendants declined to engage with Plaintiffs' emails or to speak by phone before filing their motion to compel. Plaintiffs were hindered in their ability to investigate early because Defendants would not answer any of Plaintiffs' questions, insisted they were "away from their desks," and then surprised Plaintiffs with their motion.

Moreover, in a good-faith effort to keep Defendants updated on the scope of production, Plaintiffs sent Defendants an email seeking to keep Defendants updated on what they could produce as early as November 9th, the same day as Judge Davis's order, Boden Dec., Ex. B. Plaintiffs sent a sample report (in PDF) and offered further clarification on November 12th, 2018. *See* Boden Dec., Ex. C. Those emails indicate that Plaintiffs had begun investigating what they could produce upon receiving Defendants' October 31st email. There was simply no delay or lack of investigation or failure to communicate about the form of production.

Nevertheless, these allegations against Plaintiff are irrelevant: RFPD did not specify a format for production, and Plaintiffs were only required to produce the data as it is normally maintained. PDF is that format. And because Plaintiffs only were able to access the produced documents in PDF, PDF qualifies as "native format" anyhow.

## III. DEFENDANTS HAVE NOT BEEN PREJUDICED

Defendants have not been prejudiced by the timing of production. They have had 99% of this data in their possession since November 14—over a month before summary judgment briefs

were due.[10]  And they agreed to the dates of production and briefing schedule (indeed, they participated in crafting the production dates and sought and obtained two extensions of the summary judgment deadlines afterwards).  They've likely had the data in their possession now for longer than they would have had there been no discovery dispute at all.  The fact that they've not made use of the data is their fault alone.

Nor have Defendants been prejudiced by the format of production.  The PDF documents give them the exact information they "need," if they would simply make use of it.  They could pay to convert the PDF documents to Excel.  They could manually enter some of the documents into Excel, or into any other program they want.  They could analyze a smaller portion of the data, or from fewer restaurants, to save time or resources. But they have not sought to make *any* reasonable use of the data.

## IV.  THE SUBPOENAS WERE DEFENDANTS' IDEA AND PLAINTIFFS ENCOURAGED THEM IN GOOD FAITH

After production, Defendants communicated their intent to serve third-party subpoenas. Plaintiffs in good faith did not oppose this effort, because they hoped that the third parties would either have the data,[11] confirm to Defendants that Plaintiffs did not have the ability to produce it in their preferred form, or finally convince Defendants that Plaintiffs could not simply "direct" the

---

[10] In their motion for discovery, Defendants say that Plaintiffs produced the documents "only ten days away from the Court's summary judgment deadline."  Plaintiffs do not know how Defendants calculated this timeline.  Plaintiffs produced over 68,000 documents on November 14, 2018.  They produced documents related to a fourth restaurant on November 21, 2018.  Motions for summary judgment were due December 17, 2018.  Defendants thus had the bulk of the documents in hand for over a month before motions for summary judgment were due, and have now had them in hand for nearly two months.

[11] Third-party Micros did not confirm to Plaintiffs that they lacked access to the data until Nov. 26, 2018.  *See* Boden Dec., Ex. A.  Even then, Plaintiffs supported Defendants issuing the subpoenas in the hopes that Defendants would finally believe what Plaintiffs had repeatedly told them: Plaintiffs could not export the data in Excel at any cost (because that was a paid service and, if subscribed to now, would only apply prospectively) and could not access the raw data themselves.

third parties to turn over the data, as Defendants had repeatedly insisted in the face of Plaintiffs'

denials. Plaintiffs thus provided the names of the two companies that make Plaintiffs' software:

Micros and POSitouch. It turns out that Micros is owned by Oracle. It also turns out that neither

Micros, Oracle, nor POSitouch have access to Plaintiffs' sales data.[12] Defendants now claim that

Plaintiffs encouraged the subpoenas in bad faith, and intentionally provided the incorrect vendor

name (Micros instead of Oracle).

Not so. Plaintiffs encouraged the subpoenas in the hopes that Defendants would obtain the

documents they sought or get confirmation of what Plaintiffs had said—they could not export the

past data in Excel at any price (they could only subscribe to that service prospectively) and they

could not access the underlying data themselves—so that the parties could finally move on to the

merits. Moreover, Plaintiffs did not know Defendants could not subpoena Micros directly and

would have to subpoena the parent company instead. This was not some disingenuous attempt to

mislead Defendants—the theory that Plaintiffs were trying to hide something by giving Defendants

the name of a subsidiary rather than the parent is not credible.

## V. DEFENDANTS ABUSED THE COURT'S LIMITED PERMISSION TO ISSUE THIRD-PARTY SUBPOENAS

While Plaintiffs in good faith supported Defendants efforts to gather documents by third-

party subpoena, Plaintiffs did not know that Defendants were issuing the subpoenas in a fishing

expedition for documents to use in support of the present motion. Defendants explicitly

represented to Plaintiffs and to the Court that they would *only* seek subpoenas to gather sales and

financial documents. Doc. 81 at 1 (requesting "leave from the Court to serve third party subpoenas

---

[12] The subpoenaed documents actually confirm what Plaintiffs told Defendants all along: 1) Plaintiffs did not have the capacity to export and produce the data in Excel, and 2) Plaintiffs could not simply "direct" the vendors to produce the data or documents in Excel. Any such production was a paid service that would require a third party.

to obtain Plaintiffs' own sales and inventory data"). They secured Plaintiffs' non-opposition, and the Court's permission, on that basis. They further represented to Plaintiffs and to the Court that they would only seek data pertaining to a fourth restaurant, located in Washington, D.C., dating back to its merger with the Plaintiff restaurant. *Id.* at 6 n.5 ("As agreed, Defendants will only seek post-merger data from Café Deluxe."). In reality, they asked for (among other things) "[a]ll sales data," "[a]ll communications," and "[a]ll communications with third parties," for all four restaurants, including Café Deluxe, since January 1, 2015. *See* Boden Dec., Ex. D (Subpoena).

Upon receiving a copy of the subpoena, which demanded production beyond the scope represented to Plaintiffs and the Court, Plaintiffs objected and repeatedly asked Defendants to narrow the subpoena so that it conformed to what they asked for in their Motion for Leave to Issue Third Party Subpoenas. Defendants' refusal abused the Court's permission.

In the end, the subpoena responses confirm what Plaintiffs have said all along. Plaintiffs cannot export the data in Excel. Of course it's true that any party, *including Defendants*, can *pay a third party* to *convert* the PDF documents to Excel. Plaintiffs can also pay a third party to access and create a data export of the underlying information via coding. That doesn't contradict Plaintiffs' account—it confirms it.

## VI. DEFENDANTS' FAILURE TO TAKE TIMELY DEPOSITIONS IS NOT PLAINTIFFS' FAULT

In a December 14, 2018, email, Defendants indicated their desire to depose Plaintiffs' Rebuttal Expert five days later on December 19, 2018. Boden Dec., Ex. F. In response, Plaintiffs indicated that the Court ordered Defendants to complete all depositions by November 28, 2018, and that date has not been extended. *Id.* The parties do not have the ability to extend the discovery deadlines on their own. Local Rule 37(F). If Defendants wanted to depose Dr. Nelson, they needed an extension.

It was not bad faith to refuse to allow Defendants to take Dr. Nelson's deposition out of time. Plaintiffs have scheduled Dr. Nelson's depositions twice, and sent attorneys to Washington, D.C., twice, only for Defendants to cancel at the last minute. Plaintiffs are understandably wary when it comes to scheduling a deposition for the third time, after the close of discovery, and after the motions for summary judgment have already been filed. Plaintiffs simply requested that Defendants ask for leave to take the deposition as required by Local Rules.

## VII. PLAINTIFFS' MANY OTHER ACCUSATIONS ARE FALSE

Defendants include a host of other accusations, each of which is addressed below.

### A. Defendants' Claims that Plaintiffs Wrongly "Refused" To Produce Daily Inventory Reports Are Flat Wrong

Defendants argue that Plaintiffs were wrong to provide monthly inventory reports over daily inventory reports (which would have had to have been individually generated for *each day*, for about 365 days, for each restaurant—and which would have taken hours or days, if not weeks, to complete). But the request itself asked for inventory reports "daily *if they exist or as maintained*." Doc. 71-1 at 7 (emphasis added). Plaintiffs provided monthly inventory reports because that's how they maintain them. There was nothing improper about that.

### B. Plaintiffs Never Claimed That the Underlying Data "Does Not Exist"

Defendants allege that Plaintiffs incorrectly stated that the underlying sales data did not exist at all. The emails that Defendants cite are plain: Plaintiffs never claimed that the data did not exist—that would be absurd given that they *provided the data to Defendants in PDF form*. They claimed only two things: 1) *certain documents* did not exist (for example, because Plaintiffs' data did not go back that far, or because Plaintiffs did not maintain them), or 2) Plaintiffs could only supply the data in PDF format because the data did not exist *in Excel*. *See, e.g.*, Doc. 116-6 at 2 ("Just because some of the documents you want do not exist (or do not exist in the format you

belatedly requested) does not mean we did not comply."); *Id.* at 3 ("Sales data *in Excel* does not exist") (emphasis added). Both of those statements are true.

### C. Plaintiffs Opinion-Editorial in the Washington Post Discussed the Defendants', Not the Court's, Use of Taxpayer Funds

Defendants state that Plaintiffs' Counsel wrote an editorial, published in the *Washington Post*, "disputing the Court's order." That is absolutely false. Counsel's editorial does not mention the Court or the Court's orders once. The editorial is solely a piece questioning ABC's use of public monies to enforce and defend its happy hour advertising restrictions—which Plaintiffs' Counsel believes is a matter of public interest and concern.

### D. Plaintiffs' Relevance Objections Were Proper

Defendants accuse Plaintiffs of improperly objecting based on relevance "even after" Judge Davis's order. As Plaintiffs explained to Defendants, when they turned over the documents, they wanted to preserve the objection in the event of appeal. There's nothing improper about that, it shows no disrespect to the Court or to opposing counsel, and Plaintiffs did not withhold any documents based on this objection. Counsel was simply protecting the clients' interests by preserving the objection.

## VIII. DEFENDANTS' MOTIONS SHOULD BE DENIED

Defendants have asked for extraordinary remedies: dismissal, sanctions, an adverse inference on all factual allegations, or denial of summary judgment. Their motions should be denied for two primary reasons: 1) their motion under Rule 56(d) fails because they actually have the data in hand that is supposedly necessary to prove their claims (they just refuse to make reasonable use of it), and 2) their motion under Rules 26 and 37 should be denied because Plaintiffs have complied with their discovery obligations and have not engaged in bad faith.

First, Defendants have the data that they "need" to prove their claims in their possession. Specifically, they claim that they need sales data "to demonstrate how discounted alcohol and happy hour affect consumer behavior and on-premises alcohol consumption."[13] They say they "expect[] the data to show that happy-hour patrons at Chef-Geoff's-Tysons Corner consume less alcohol on average than happy-hour patrons at Lia's, Chef Geoff's-Washington DC., and Café Deluxe-Washington, DC."[14] They also say they "expect the data to show that Chef Geoff's-Tysons Corner's happy-hour business is strong relative to other times of the day and relative to Lia's, Chef Geoff's Washington, DC, and Café Deluxe-Washington, DC."[15] But they have all the data necessary to make these showings.[16] And they have the capacity to make use of it, either by paying a third party to convert the PDFs to Excel, or by manually inputting the data into Excel or another program themselves. If Defendants believed the former to be too expensive, or the latter to be too burdensome, they could've shortened the data set and only used one month's or one week's worth of data, which would've greatly reduced the burden. Defendants cannot claim they are unable to prove their claims when they have the very data they seek in hand, and the Court should not deny Plaintiffs' summary judgment on that basis.

---

[13] Defendants' contentions that Plaintiffs are trying to "hide" this data is even more unbelievable given that Plaintiffs have consistently argued that such data 1) is ultimately irrelevant, because it does not demonstrate the effect of *advertising* happy hour, which is the subject of this case, and 2) would not affect the outcome anyway, because Defendants may not prohibit truthful, non-misleading speech for the purpose of deterring legal consumption in the first place.

[14] This evidence could not prove that *advertising* caused the disparity in consumption levels, but Plaintiffs provided this data anyway.

[15] Plaintiffs believe that whether a law that restricts speech is narrowly tailored does not depend on how much money the speaker makes, but Plaintiffs provided this data anyway.

[16] Defendants also claim that their expert "could have analyzed the information and shown results critical to demonstrating the constitutionality of the regulations at issue." But Defendants do not explain how that evidence would have been admissible, given that Defendants issued their discovery requests such that responses were due after the submission of their expert report.

Second, Plaintiffs have complied with their discovery obligations and have not acted in bad faith. While Plaintiffs, *in good faith*, opposed what they perceived to be Defendants' belated attempts to gather discovery, immediately following Judge Davis's order they supplied all requested documents. They did so within a very short time frame, and included a reasonable investigation. They could not have investigated any earlier because Defendants' RFPD 3 was not specific enough to put Plaintiffs on notice that Defendants desired six years of specific data related to several restaurants—many of which were not included in the Complaint (and many of which Plaintiff Tracy did not even obtain a financial interest in until after the filing of the lawsuit). Yes, the parties had a discovery dispute regarding RFPD 3, which delayed this process. But once that dispute was resolved, Plaintiffs acted quickly to provide all responsive documents. Defendants' motion for relief should be denied.

## CONCLUSION

There's been no misconduct here. Plaintiffs do not fear the data's production and did not work "hard" to preclude Defendants from getting it; they produced the data voluntarily and worked hard to produce it in very little time. They did not fail to investigate in a timely manner; the time between Defendants' first mention of financial documents and the date of production was a mere three weeks. They did not try to mislead Defendants into issuing subpoenas to the wrong party;

they supported Defendants' attempts to obtain the data via third parties.[17]    Defendants'

accusations are false, and their motion must be denied.

DATED:  January 9, 2019.

Respectfully Submitted,

_____/s/ Thomas A. Berry_____
THOMAS A. BERRY, Va. Bar No. 90555
E-Mail:  TBerry@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA  22201
Telephone:  (202) 888-6881
Facsimile:  (202) 888-6855

ANASTASIA P. BODEN, Cal. Bar No. 281911*
E-Mail:  ABoden@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747

*Counsel for Plaintiffs CG4, LLC, dba
Chef Geoff's-Tysons Corner, and Geoff Tracy*

*\*Pro Hac Vice*

---

[17] That turned out to be a mistake, given that Defendants issued subpoenas far broader than what they represented to the Court so that they could obtain documents for the purpose of filing the present motion.

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on January 9, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which also served all parties electronically.

DATED:  January 9, 2019.

Respectfully Submitted,

_____/s/ Thomas A. Berry_____
THOMAS A. BERRY, Va. Bar No. 90555
E-Mail:  TBerry@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA  22201
Telephone:  (202) 888-6881
Facsimile:  (202) 888-6855

ANASTASIA P. BODEN, Cal. Bar No. 281911*
E-Mail:  ABoden@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747

*Counsel for Plaintiffs CG4, LLC, dba*
*Chef Geoff's-Tysons Corner, and Geoff Tracy*

*\*Pro Hac Vice*