**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **CG4, LLC, d/b/a**<br>**CHEF GEOFF'S-TYSONS CORNER,** *et al*.<br><br>          **Plaintiffs,**<br><br>**v.**<br><br>**TRAVIS HILL,** *et al.,*<br><br>          **Defendants.** | **Civil Action No. 1:18-cv-360-AJT** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
<u>MOTION TO EXCLUDE TESTIMONY AND REPORT OF JON NELSON</u>**

## INTRODUCTION

Travis Hill, Jeffrey Painter, Maria J.K. Everett, Beth Hungate-Noland, and Mark Rubin (hereinafter, "ABC") respectfully move the Court to exclude the report of Plaintiffs' expert witness because (1) Plaintiffs failed to disclose their expert as an affirmative witness before using him throughout their case-in-chief, and (2) Plaintiffs' expert did not produce a rebuttal report. Rather, Plaintiffs' expert report addresses only the same general subject matter, alcohol, but does not directly contradict or rebut the actual contents of ABC's expert report regarding consumer behavior during happy hours.

Plaintiffs bring facial and as-applied First Amendment challenges to Virginia's happy-hour advertising restrictions.[1] In accordance with the commercial speech doctrine, ABC must show the efficacy of these laws in curbing alcohol overconsumption. A central aim of the happy-hour advertising restrictions is to enact moderate controls on the price of discounted alcohol during happy hours, which is a high-risk time for heavy consumption. Thus, establishing the price sensitivity of individuals is a key component of ABC's justifications for its regulations.

To that end, ABC sought the expert opinion of Dr. Derek Reed, an expert who specializes in consumer behavior and decision making in happy-hour settings. Dr. Reed recently completed a field study using the Alcohol Purchase Task—a crafted vignette that predicts consumer behavior and is a critical tool in behavioral economics—and found that individuals 1) are price-sensitive when making decisions regarding alcohol consumption, and 2) consume more alcohol for bundled discounts compared to half-price discounts ("Reed Report").

Plaintiffs did not identify an expert for their case-in-chief. Instead, Plaintiffs disclosed Dr. Jon Nelson, a classical economist, to rebut Dr. Reed's conclusions ("Nelson Report").

---

[1] Plaintiffs specifically challenge Va. Code Ann. § 4.1-111(B)(15); 3 Va. Admin. Code 5-50-160(B)(4); and 3 Va. Admin. Code 5-50-160(B)(8).

Although Dr. Nelson made perfunctory statements that he disagreed with Dr. Reed's results, not once did he address the field of behavioral economics or explain why it was ill-suited to support justifiable alcohol policy.  Dr. Nelson instead offered his alternative theory based upon data that was irrelevant to the issues at hand and did not address Dr. Reed's specific findings that relate to *alcohol consumption in a happy-hour setting*.  Compounding that error, Plaintiffs relied extensively on Dr. Nelson's conclusions to support their own motion for summary judgment. Thus, it is clear that Dr. Nelson is not a rebuttal expert, and his expert report must be stricken.

## STATEMENT OF FACTS

The Parties' Proposed Discovery Plan ("Discovery Plan"), as ratified by the Court, required Plaintiffs to disclose any expert who may be called to testify at trial and provide reports on or before July 30, 2018.  (Dkt. No. 21 at ¶ G.)  The Discovery Plan required ABC to disclose any expert by September 3, 2018.  (*Id.* at ¶ H.)  Rebuttal reports were due September 27, 2018. (*Id.* at ¶ I.)  Plaintiffs did not disclose any initial expert reports.

### A.    ABC Discloses The Reed Report

On September 4, 2018,[2] ABC submitted the expert report by Dr. Derek Reed ("Reed Report").  (Dkt. No. 108 at 25.)  Dr. Reed received his PhD in school psychology and is a Board Certified Behavior Analyst at the Doctoral Level.  (Reed Report at ¶ 1, Dkt. No. 108 at 7.)  He currently works as a professor at the University of Kansas, where he directs the Applied Behavioral Economics Laboratory and investigates addiction and addictive behaviors. His research examines the behavioral processes underlying irrational and complex decision making. The majority of his research "focuses on the use of behavioral economics to understand consumer decisions, especially in the domain of substance use."  (*Id.* at ¶ 2, Dkt. No. 108 at 7.)

---

[2] September 3, 2018 fell on Labor Day, which is a recognized federal holiday.  Fed. R. Civ. P. 6(a)(6).

Dr. Reed provided a report for ABC that considered whether the challenged happy-hour advertising regulations furthered ABC's mission of promoting "public safety through the responsible sale and regulation of alcoholic beverages." (*Id.* at ¶ 5, Dkt. No. 108 at 8.)  Dr. Reed relied "extensively on [his] scientific research findings and the academic literature in behavioral science on the behavioral economics of purchasing." (*Id.* at ¶ 7, Dkt. No. 108 at 8.)  The primary academic discipline underlying Dr. Reed's research is "operant behavioral economics," which "studies organisms' consumption of a commodity in the context of constraint, where constraint is typically conceptualized as the external pressures, such as effort or cost (often in financial prices), associated with accessing that commodity." (*Id.* at ¶ 13, Dkt. No. 108 at 12.)  Dr. Reed also applied traditional behavioral economics, which "assumes irrational consumer responding due to cognitive biases that are internal factors within consumers that are sensitive to environmental cues." (*Id.* at ¶ 14, Dkt. No. 108 at 12.)  Dr. Reed applied these models to his framing experiment, which notes that presenting similar information in varied ways will produce different, yet observable behavioral outcomes. (*Id.*)  In that vein, Dr. Reed distinguished behavioral economics from classical economic theory, the latter of which predicts only a linear relation between consumption and cost. (*Id.* at ¶ 16, Dkt. No. 108 at 13.)

The key component of Dr. Reed's research was using the Alcohol Purchase Task, which is the "gold standard assessment" in "the field of behavioral economics." (*Id.* at ¶ 19, Dkt. No. 14.)  The Alcohol Purchase Task entails a simulated purchasing event wherein an individual is asked to imagine that he or she is at a bar on a weekend night, and domestic beers, glasses of wine, and shots of hard liquor are available for personal use.  From there, the individual is given three different scenarios:  the drinks are full price, half off, or buy one get one free.  Following the vignette, the individual is asked to indicate how many drinks they would purchase at these

4

various prices.  Reported consumption at each price is plotted as a function of drink unit pricing to create a demand curve.  (*Id.* at ¶¶ 19-21, Dkt. No. 108 at 14-15.)  Dr. Reed published his findings in a peer-reviewed journal, Experimental and Clinical Pyschopharmacology, on January 22, 2018.  (App'x 2 at 156, Dkt. No. 108 at 83.)

Also in 2018, Dr. Reed assisted five other academic researchers in performing a systematic review of the Alcohol Purchase Task to assess the variability in administering that Task.  (App'x 3 at 117, Dkt. No. 108 at 96.)  The review analyzed the psychometric properties of the Alcohol Purchase Task and determined that it had adequate temporal stability, internal reliability, predictive validity in identifying individuals with alcohol use disorders, and convergent validity in relating to other established clinical scales of alcohol misuse and dependence.  (*Id.* at 119-20, Dkt. No. 108 at 98-99.)

Based on the data and research that he analyzed, Dr. Reed determined that "[h]appy hour pricing has a significant impact on the level of alcohol consumption."  (*Id.* at ¶ 9(a), Dkt. No. 108 at 9.)  Specifically, Dr. Reed found that "[l]ower prices produce higher levels of consumption that are persistent against relative increases in price."  (*Id.*)  Dr. Reed also opined that phrasing "happy hour specials as 'buy one get one free' has a statistically significant impact on the level of alcohol consumption compared to happy hour specials phrased as 'half-price' discounts." (*Id.* at ¶ 9(b), Dkt. No. 108 at 10.) Therefore, the happy-hour advertising restrictions further the Commonwealth's public health interests and relate directly to that goal.  (*Id.*)

### B.    Plaintiffs Disclose The Nelson Report As A Rebuttal Report

On September 27, 2018, Plaintiffs disclosed Dr. Jon Nelson, an economist, to respond to the merits of Dr. Reed's report.  (Nelson Report at ¶ 2, Dkt. No. 103-1 at 3-4).  Dr. Nelson criticized Dr. Reed's methodology because "[e]xisting field and experimental studies of

'discount pricing' contain mixed and inconclusive results" and "do not reflect the complexities of real-world decisions regarding alcohol purchases . . . ." (*Id.* at ¶ 7(d), Dkt. No. 103-1 at 8.) Instead, Dr. Nelson posited that "[n]atural experiments"—such as those identified in Exhibits 6, 7, and 8 of the Nelson Report—"demonstrate that lower alcohol prices have selective effects, rather than broad impacts on alcohol consumption and drinking patterns." (*Id.* at ¶ 7(c), Dkt. No. 103-1 at 7.)

To support his conclusions, Nelson attached eight of his own articles that detail his classical economic approach to analyzing consumer trends in alcohol consumption.  The first article ("Nelson 1990a") examined the effect of state monopolies and other regulations on the consumption of distilled spirits, wine, and beer.  (Nelson 1990a at 84, Dkt. No. 103-1 at 47.) Nelson used "natural experiments" and a "mixture of classical and Bayesian econometric procedures" to determine that there was "no evidence that monopoly control has a direct effect on consumption, although indirect effects may occur through the price level." (*Id.* at 90, 94, Dkt. No. 103-1 at 53, 57.)  Dr. Nelson used price data from the quarterly price survey Inter-City Cost of Living Indicators, which is published by the American Chamber of Commerce Researchers Association" ("ACCRA").[3]  (*Id.* at 86, Dkt. No. 103-1 at 49.)  Dr. Nelson's research was limited to "off-premise consumption."  (*Id.* at 95, Dkt. No. 103-1 at 58.)

The second article ("Nelson 1990b") examined "those economic and regulatory variables that are most likely to have a direct effect on the demand for alcoholic beverages . . . ." (Nelson 1990b at 224, Dkt. No. 103-1 at 64.)  Relying on ACCRA data, Dr. Nelson concluded that "[a]lcoholic beverage demand is largely determined by the own-price, consumer's real income,

---

[3] As of 1990, ACCRA was limited to Schlitz or Budweiser beer, Seagram's Seven-Crown Whiskey, and Paul Maisson Chablis wine.  (Nelson 1990a at 86, Dkt. No. 103-1 at 49.)  In later years the survey focused on Heineken and 1.5 liter bottles of White Table Wine that consumers intended to serve in their own home.  (Reed 2d Decl. at ¶ 10, Exh. A at 20.)

and tourism activity within a state[.]" (*Id.* at 226, 239, Dkt. No. 103-1 at 65, 71). Dr. Nelson's studies were limited to off-premise consumption, and he noted that "bans on price advertising should raise consumer search costs, therby [sic] lowering consumption and raising the mean and variance price." (*Id*. at 230-31, Dkt. No. 103-1 at 67.)

The third article ("Nelson 2003") analyzed "the importance of several restrictive alcohol regulations, including advertising bans for billboards, bans on price advertising, state monopoly control of retail stores, and changes in the minimum legal drinking age." (Nelson 2003 at 1, Dkt. No. 103-1 at 76.) Dr. Nelson focused his study on the effects of substitution where the "restrictive law . . . applies only to one beverage[, which] can result in substitution toward other beverages . . . ." (*Id.*) For example, a ban of billboard advertising of spirits was expected to reduce consumption of distilled spirits, but consumers would gravitate towards wine or beer. (*Id.* at 12, Dkt. No. 87.) Notably, Dr. Nelson looked only at the "*total* alcohol demand," meaning he did not address the impact of the advertising regulations on the specific product. (*Id.* at 13, Dkt. No. 103-1 at 88.) Quite the opposite; Dr. Nelson admitted that banning price advertisements for a particular type of alcohol "should increase search costs and reduce competition, thus resulting in higher full prices and lower demand." (*Id.* at 12, Dkt. No. 103-1 at 87.) In other words, Dr. Nelson found that "a price advertising ban could reduce alcohol consumption by elevating the general level of money or full prices." (*Id.* at 3, Dkt. No. 103-1 at 78.) Also noteworthy is that Dr. Nelson compared alcohol consumption of control states with alcohol consumption of license states. (*Id.* at 2, Dkt. No. 103-1 at 77.)

The fourth article ("Nelson 2013") studied the price elasticity of adult drinkers who drank heavily. (Nelson 2013 at 267, 272, Dkt. No. 103-1 at 105, 110.) Nelson 2013 also relied on ACCRA data. (*Id.* at 272, 278, Dkt. No. 103-1 at 110, 116.) Although Dr. Nelson determined

that heavy drinkers did not respond to increases in the price of alcohol, "the evidence is consistent with price being important for moderate drinkers and possibly for participation and drinking by the youngest adult respondents." (*Id.* at 273-74, Dkt. No. 103-1 at 111, 112.)

The fifth article ("Nelson 2015") studied the effects of alcohol prices on binge drinking for youth, young adults, and adults. (Nelson 2015 at 1, Dkt. No. 103-1 at 131.) Dr. Nelson opined that "increased alcohol taxes or prices are unlikely to be effective as a means to reduce binge drinking" because "price and tax elasticity estimates for general populations may not apply equally to binge drinkers and other excessive drinkers." (*Id.* at 131-32) Dr. Nelson looked at aggregated data from multiple countries, not just the United States. (*Id.* at 9.)

The sixth article ("Nelson 2016a") similarly limited the research to "price-tax results for heavy-drinking adults and young adults." (Nelson 2016a at 37, Dkt. No. 103-1 at 146.) And again, Dr. Nelson expanded his analysis to multiple countries. (*Id.*) Dr. Nelson suggested "more targeted approaches to alcohol control" as the "preferred" method to combating abusive drinking. (*Id.* at 39, Dkt. No. at 147.)

The seventh article ("Nelson 2016b") conducted a "comprehensive review of natural experiments for a wide variety of harms from studies published during 2003 to 2015." (Nelson 2016b at 264, Dkt. No. 103-1 at 150.) Dr. Nelson surveyed nine countries, including Australia, Denmark, Finland, Hong Kong, Iceland, Russia, Sweden, Switzerland, and the United States. (*Id.*) Aggregating data from these countries, Dr. Nelson noted that the results were "mixed," leading to his conclusion that price was not a surefire method for curbing overconsumption. (*Id.* at 270, Dkt. No. 103-1 at 156.) Curiously, Dr. Nelson's results indicated that the United States experienced "positive evidence for policy effects" on "alcohol-related harms." (*Id.* at Table 3, Dkt. No. 103-1 at 154.)

The eighth article ("Nelson 2017") reviewed empirical studies of alcohol policy interventions in Denmark, Finland, Hong Kong, Sweden, and Switzerland, and concluded that "alcohol tax interventions had selective, rather than broad, impacts on subpopulations and drinking patterns." (Nelson 2017 at 417, Dkt. No. 103-1 at 160.) Dr. Nelson did not study data from the United States.

Although the Nelson Report purportedly critiques Dr. Reed's use of the Alcohol Purchase Task, he did not contradict the economic principles underlying the Reed Report or address the specific, objective data used in Dr. Reed's experiment. Absent from the Nelson Report is any mention of behavioral economics, which was the philosophical underpinning of Dr. Reed's work. (Reed Report at ¶ 2, Dkt. No. 108 at 7.) Nelson did not replicate the experiments that Reed performed. And Nelson did not consider how advertising information may affect consumer behavior specifically in a happy-hour setting. Instead, Nelson produced his own work in the field of classical economic theory. These articles do not rely on behavioral economics, but classical economic models such as natural studies. (Reed 2d Decl. ¶¶ 13-14.) And, Dr. Nelson introduced for the first time data points and sources that he believed were relevant to the analysis of alcohol consumption trends, but were not relevant or undiscussed in the Reed Report.[4] These broad assertions relate only to the general subject matter at hand, general alcohol consumption and advertising, and not consumption during happy hour as examined by Dr. Reed.

## C.    Plaintiff Uses The Nelson Report To Support Their Case-In-Chief

Despite calling the Nelson Report as "rebuttal report," Plaintiffs cited to Dr. Nelson's opinions approximately twenty times in their motion for summary judgment. (Dkt. No. 96 at 12-

---

[4] As discussed in greater detail below, these data points include Dr. Nelson's use of ACCRA data instead of simulating his own experiments, focusing on price elasticity of only heavy drinkers, and aggregating consumption patterns from countries other than the United States.

18.)  Rather than use the Nelson Report to undermine confidence in the Reed Report,[5] Plaintiffs

argued that Dr. Nelson's economic model is the preferred approach.  (Dkt. No. 96 at 18 ("As Dr.

Nelson states, observational studies (which observe behavior under conditions outside of the

investigators' control), and, in particular, natural experiments, *provide much stronger evidence*

for the effect of stimuli like advertising, or prices, on behavior.").)  Because Plaintiff relied on

Dr. Nelson's novel theories and data—which did not directly contradict Dr. Reed's expert

opinion—to support their case-in-chief, Plaintiffs were obligated to submit the Nelson Report on

July 30, 2018, and not as a rebuttal expert on September 27, 2018.  This failure to abide by the

plain terms of the Discovery Plan compel this Court to exclude the Nelson Report.

## LEGAL STANDARD

Rebuttal reports are "intended solely to contradict or rebut evidence on the same subject

matter identified by another party . . ." Fed. R. Civ. P. 26(a)(2)(D)(ii).  The function of rebuttal

testimony is to explain, repel, counteract or disprove evidence of the adverse party." *United

States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005) (internal quotation and citation omitted);

*Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir. 1999) ("The principal objective of rebuttal is to permit

a litigant to counter new, unforeseen facts brought out in the other side's case.").

"If a party fails to provide information or identify a witness as required by Rule 26(a) or

(e), the party is not allowed to use that information or witness . . . at a trial, unless the failure was

substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The district court has "broad

discretion" to determine whether a Rule 26(a) violation is substantially justified or harmless.  *S.

States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

---

[5] Plaintiffs' tactic in creating a credibility issue in ABC's evidence is dubious because this Court must resolve any competing, rational inferences in the light most favorable to the non-movant. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cautioning district courts to employ separate standards of review when faced with cross-motions for summary judgment).

**ARGUMENT**

ABC requests that this Court grant ABC's motion to exclude Nelson's report and testimony because (1) Plaintiffs impermissibly rely on Dr. Nelson's rebuttal report to support their own case-in-chief; and (2) Dr. Nelson does not provide a rebuttal to Dr. Reed's expert opinion as required by Rule 26(a)(2)(D)(ii).

## I.    PLAINTIFFS IMPERMISSIBLY RELY ON DR. NELSON'S REBUTTAL REPORT TO SUPPORT THEIR CASE-IN-CHIEF.

 "A party may not use rebuttal as an attempt to introduce evidence that he should have introduced in his case-in-chief." *Steele v. Kenner*, 129 F. App'x 777, 780 (4th Cir. 2005). "Rebuttal evidence is defined as evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party." *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001).  As such, rebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir.1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief.").

Plaintiffs' Memorandum in Support of Motion for Summary Judgment contains approximately twenty citations to the Nelson Report to support their argument that "advertising has little to no effect on consumption." (Dkt. No. 96 at 12.)  Plaintiffs tout Dr. Nelson's "rebuttal report, based on natural experiments in various countries" as proof that "price advertising alone is unlikely to result in a significant bidding war." (*Id.* at 14.)   Indeed, Plaintiffs cite to the Nelson Report to argue that natural experiments like the ones Dr. Nelson conducted provide a more accurate method of determining the effects of bans on price

advertisements than Dr. Reed's experimental method.[6]   (*Id.* at 18.) Plaintiffs, however, were obligated to disclose Dr. Nelson in their initial disclosure as required by the Discovery Plan before relying on his methodology to argue why they should be entitled to relief as a matter of law.  *See Braun v. Lorillard, Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) ("The plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case . . . must put in his evidence on the issue as part of his case in chief.").

Plaintiffs failed to disclose any initial expert pursuant to Rule 26(a)(2)(A) but relied on Dr. Nelson's expert opinion in their case-in-chief to support their argument that the Nelson Report "demonstrates that advertising has little to no effect on consumption."  (Dkt. No. 96 at 12.)  Plaintiffs' use of Dr. Nelson's opinion to support their motion for summary judgment is improper and must be excluded.

## II.   DR. NELSON'S EXPERT REPORT IS NOT A TRUE REBUTTAL TO DR. REED'S EXPERT REPORT.

"Rebuttal evidence may be introduced only to counter new facts presented in the defendant's case-in-chief."  *Allen v. Prince George's Cty.*, 737 F.2d 1299, 1304 (4th Cir. 1984). "Thus, '[r]ebuttal experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." *Boles v. United States*, No. 1:13-cv-489, 2015 U.S. Dist. LEXIS 42332, at *5 (M.D.N.C. Apr. 1, 2015) (citation omitted).

Persuasive authority further explains that "[i]f the purpose of expert testimony is 'to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.'" *Amos v. Makita U.S.A., Inc.*, No. 2:09–cv–013040–GMN–RJJ, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011) (unpublished) (quoting *In*

---

[6] As discussed in ABC's Opposition Brief, Plaintiffs' use of Dr. Nelson in their opening brief to dispute Dr. Reed's conclusions was entirely improper because ABC was entitled to all favorable inferences as the nonmoving party.  (Dkt. No. 122 at 1.)

*re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir. 1992)).  [R]ebuttal reports "may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert."  *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013).  "'[E]xpert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports.'" *Boles*, 2015 U.S. Dist LEXIS 42332, at *5 (quoting *Withrow*, 967 F. Supp. 2d at 1002).

The district court in *Boles* faced a similar question and ultimately struck the plaintiff's experts.  In that negligence action, the plaintiff did not file any affirmative expert reports as required by the scheduling order.  *Boles*, 2015 U.S. Dist. LEXIS 42332, at *1-2.  The defendant disclosed three experts who opined as to the plaintiff's vocational capacity, economic losses, and physical impairments as a result of the injuries he sustained.  *Id.* at *6-8.  In response, the plaintiff submitted four rebuttal reports from his own experts.  The plaintiff's vocational expert opined that the plaintiff suffered from mental health issues, a topic that was not addressed by the defendant's expert.  *Id.* at 7.  The plaintiff's economist determined the plaintiff's lost wages even though the defendant's expert explicitly did not include lost wages in her calculation because the plaintiff had not made such a claim.  *Id.* at *7-8.  The plaintiff's orthopedic surgeon included psychological injuries in his assessment of the plaintiff's impairment rating.  Finally, the plaintiff's psychiatrist gave his opinion as to the plaintiff's mental health issues, which was not a topic the defendant broached in its expert reports.  *Id.* at *11-12.  The court struck each of these experts because the plaintiff should have disclosed them in his initial disclosure.  The court noted that the vocational expert, economist, and orthopedic surgeon all opined as to plaintiff's damages, which was plaintiff's burden to prove.  *Id.* at *11.  With respect to the psychiatrist, the

court noted that although his report generally embraced the same subject matter as the defendant's vocational expert, he did not directly contradict those findings because he relied on a substantive piece of data—plaintiff's mental health—that was not addressed by the defendant's experts. *Id.* at 12.

Dr. Reed examined how pricing and promotional framing, such as "buy one get one free," has a statistically significant impact on alcohol consumption during happy hours. (Reed Report at 3-5). In response, Nelson did not rebut Reed's findings about happy-hour pricing or promotions. Nelson instead focused on advertising bans and general alcohol demand. That is inapposite to the case at hand, as the regulations allow happy-hour advertising (with limited descriptors) and concern only on-premises alcohol consumption within a limited time period. Thus, the Nelson Report is precisely the type of expert report that was excluded in *Boles*, and the same result should apply here.

### A. The Nelson Report Uses An Economic Model That Addresses Off-Premise, Aggregate Alcohol Consumption That Does Not Address Dr. Reed's Conclusions Regarding On-Premise Consumption In A Happy-Hour Setting

"[A]n expert may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert." *Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272, 274 (Fed. Cl. 2011) (citation omitted). But the new method must "directly contradict or rebut the opposing party's expert." *Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013) (striking a rebuttal expert report that applied a different analysis for comparing fee assessments without explanation).

Although Dr. Nelson purports to offer a different method from Dr. Reed for analyzing alcohol consumption trends, his approach to classical economics largely misses the target. First, the Nelson Report relies a different field of economics. Dr. Reed relied on traditional behavior economics, which assumes irrational consumer behavior that responds to "cognitive biases that

are internal factors within consumers that are sensitive to environmental cues." (Reed Report at ¶ 14, Dkt. No. 108 at 12.)  By contrast, the exhibits supporting the Nelson Report all rely upon classical economic models to alcohol prices at large.[7]   (Reed 2d Decl. at ¶ 6.)   Classical economic assumes that human decision making is rational, driven purely by objective information, and is immune to psychological errors.  (*Id.*)  Classical economic models typically do not view the individual's subjective histories (psychology, cognitive biases, etc.) as meaningful inputs to the equation.  (*Id.*).  To be sure, Dr. Nelson did not simply use a different methodology to analyze the same facts or scenarios that the Reed Report considered.  *See Allen*, 737 F.2d at 1304.  Nelson focused his work on state-level and international data on alcohol consumption and state regulatory policies, which Dr. Reed did not discuss.  In so doing, Dr. Nelson addresses the same general subject matter of the case, alcohol, but he does not directly address the same subject matter of Dr. Reed's report, happy hours.  The Nelson Report simply bolsters Dr. Nelson's own work and findings regarding alcohol advertising bans, but it did not rebut Dr. Reed's findings regarding drinking in a happy-hour setting.

Second, Dr. Nelson did not address how promotional framing ("buy one get one free" sales) impacts alcohol consumption during happy hours.  Indeed, Dr. Nelson barely mentioned buy one get one free sales (BOGO) in his report.  First, Dr. Nelson stated that if the happy-hour regulations are changed "no one single method of promotion, such as 'buy-one, get-one,' can be

---

[7] For example, Nelson 2003 used aggregated data and simple statistical weighting to make claims regarding alcohol demand and substitution.  (Nelson 2003 at 9-12, Dkt. No. 103-1 at 84-87.)  Such empirical practices underscore the classical economic assumption that consumer behavior is a simple product of environmental inputs.  (Reed 2d Decl. at ¶ 8.)  As another example, Nelson 2015 discounted contributions of laboratory experiments employed by the social and behavioral science that would lend some insight into the role of behavioral economic influences.  (Nelson 2015 at 2-3, Dkt. No. 103-1 at 132-33.)  Under ehavioral economic models, excluding such experiments grossly aggregates data and improperly discounts psychological influences on behavior and decision making.  (Reed 2d Decl. at ¶ 9.)

anticipated as the norm in a competitive market following removal of the regulations." (Nelson Report at ¶ 9, Dkt. No. 103-1 at 10.) Speculating how licensees may market happy-hour specials absent the current regulations does not rebut Dr. Reed's findings that "BOGO happy hour pricing increased demand beyond that of either standard or half-price costs." (Reed Report at ¶ 7, Dkt. No. 108 at 9.)

Third, Nelson mentions that "Half-price (HP) offers are not statistically different from full-price (FP) offers" and that Dr. Reed's study regarding BOGO happy-hour sales is flawed because those offers are not distinguishable. (Nelson Report at ¶25(e), Dkt. No. 103-1 at 26.) But Nelson cites nothing to support the position that "half price" offers are the same as "full price" offers, particularly when examining consumer behavior relating to discounted prices, and this unsupported assertion defies logic. Furthermore, Dr. Reed made clear that these effects are not significant to his conclusions. (App'x 2 at 162, Dkt. No. 108 at 89.)

Fourth, BOGO sales are not unique to the alcohol industry. BOGO sales are a prolific marketing tool and if such sales did not have desirable consumer affects, then retailers would not use them. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 545 (2001) (noting cigarette industry used point-of-sale promotions and retail offers such as buy one, get one free, or product giveaways). Applying the Alcohol Purchase Task to other consumer goods yields similar results. (Reed Report at ¶¶ 36-37, Dkt. No. 108 at 21-21.) Because Dr. Nelson did not address in his report discounted alcohol pricing, promotional framing, and consumer behavior in a happy-hour setting, he failed to rebut Defendants' expert. As a result, Dr. Nelson addressed different and largely distinct topics under the guise of a response but his report does not qualify as a rebuttal.

Finally, Dr. Nelson relies on natural experiments, which are observations (i.e. data tracking) before and after some real-world change for which the researcher played no role.

(Reed 2d Decl. at ¶ 7.)   Natural experiments typically do not account for coincidences or confounding variables.  (*Id.*)  By contrast, Dr. Reed's Alcohol Purchase Task required his own input to control variables and establish meaningful, real-world parameters.  (Reed Report at ¶¶ 19-23, Dkt. No. 108 at 14-16.)   Thus Nelson did not examine data for on-site alcohol consumption, *i.e.*, happy-hour settings.

### B.   The Data Underlying Dr. Nelson's Opinions Are Irrelevant And Do Not Address The Substance Of The Reed Report Or The Alcohol Purchase Task

The data on which Nelson relied in his studies further demonstrate the limitations of his report.  Nelson specifically employed ACCRA data to conduct his work.  Critically, this data series contained only information on alcohol that consumers intended to serve in their home.[8]  (Reed 2d Decl. at ¶ 10, Exh. A).[9]  The ACCRA Manual instructs the data gatherers not to sample prices from discount stores, even if they are a majority of the overall market, (*id.* at 14), but analyzing the effects of happy hour pricing necessarily entails discounted pricing data.  And, opinions based on ACCRA data cannot contradict Dr. Reed's reliance on the Alcohol Purchase Task because ACCRA data does not account for individual preferences in brand or alcohol type.  (Reed 2d Decl. at ¶ 11.)

---

[8]     Even so, Nelson's underlying research on which he relies shows that "total alcohol demand is . . . negatively affected by bans of price advertising."  (Nelson 2003 at 13, Dkt. No. 103-1 at 88.).  And "[a]t the beverage level, the demands for spirits and wine are . . . negatively affected by bans of price advertising."  (*Id.*)  Similarly, Nelson determined that alcohol price resulted in a negative coefficient.  (Nelson 1990a at 91, Dkt. No. 103-1 at 54.)  Thus, Nelson previously determined that banning price advertisements resulted in decreased off-premises alcohol consumption.

[9]     ACCRA specifically directed its researchers to collect "the average price for a six-pack of Heineken's beer in 12-ounce containers. Exclude deposit, if any. Do not price 12-packs or cases and then report a prorated price. Wine: Report the average price for a 1.5-liter bottle of white table wine. It may be pinot grigio, Chablis blanc, or other white table wine of your choice. The basic rule of thumb for this items is, 'Would you serve it in your home?' Price only blends—don't price vintage years, which are more expensive.").  (Reed 2d Decl. at ¶ 10, Exh. A.)

Nelson 2015, Nelson 2016a, Nelson 2016b, and Nelson 2017 aggregated data from multiple countries, but the Reed Report included only participants from the United States. (Reed 2d Decl. at ¶12(a).) Nelson 2003 considered the effect of substitution on aggregate alcohol consumption. (Nelson 2003 at 1, 12 Dkt. No. 103-1 at 76, 87.) Substitution between alcohol types was a moot issue under Dr. Reed's research because his research modeled happy-hour policy changes, which affects all forms of alcohol. (Reed 2d Decl. at ¶ 12(c).) Finally, Nelson 2013 focused solely on the price elasticity of heavy drinkers. (Nelson 2013 at 267, 272, Dkt. No. 103-1 at 105, 110.) Dr. Reed examined drinking behaviors across the spectrum to model a general consumer population effect; he did not focus on heavy drinkers. (Reed 2d. Decl. at ¶ 12(c).)

## III.   GOOD CAUSE SUPPORTS THE EXCLUSION OF DR. NELSON'S REPORT IN ITS ENTIRETY.

In determining whether nondisclosure of evidence is substantially justified or harmless, the Court must consider:

> "(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony."

*Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011) (quoting *S. States Rack & Fixture*, 318 F.3d at 596). The Fourth Circuit does not require the Court to expressly consider each factor when evaluating discovery violations. *See, e.g.*, *Carr v. Deeds*, 453 F.3d 593, 604 (4th Cir. 2006) (affirming district court's exclusion of testimony for Rule 26(a) violation when district court did not mention *Southern States* factors). In this case, each of the five factors is met.

First, Plaintiffs surprised ABC by relying on "natural experiments" analyzed under a classical economic model to justify their challenges to Virginia's happy-hour regulatory scheme.

Because of the limited time between the disclosure of the Nelson Report and the close of discovery, ABC had little opportunity to conduct meaningful analysis of Dr. Nelson's conclusions, especially where Plaintiffs repeatedly stymied ABC's efforts to depose Dr. Nelson. (Dkt. No. 138 at 9 n.7.)

Second, ABC is unable to cure the undue prejudice that Plaintiffs' late disclosure caused because the Discovery Plan does not afford ABC any opportunity to submit their own rebuttal brief to counter Dr. Nelsons' report.  Compounding this error was Plaintiffs' refusal to turn over relevant, native data of their restaurants, which Dr. Reed could have used to test his opinions. (Dkt. No. 138 at 10-12.)

Third, Plaintiffs cannot provide any explanation for their failure to adhere to the Discovery Plan.  *See Boles*, 2015 U.S. Dist. LEXIS 42332, at *18.

Finally, excluding the Nelson Report will undoubtedly impact Plaintiffs' ability to cast doubt on the conclusions of the Reed Report, but that difficulty alone is insufficient to excuse Plaintiffs' failure to abide by the Discovery Plan.  *See Indura S.A. v. Engineered Controls, Int'l Inc.*, No. 1:10-cv-457, 2011 U.S. Dist. LEXIS 99118, at *11 (M.D.N.C. Sep. 1, 2011) (deeming this factor to weigh against exclusion of reports where such action likely would foreclose merits-based determination of claims).  The commercial speech doctrine does not require Plaintiffs to justify Virginia's happy-hour regulations, so Dr. Nelson is not required to establish a *prima facie* case.

Given the absence of any colorable excuse for Plaintiffs' non-compliance, the absence of any clear, case-dispositive impact attributable to the exclusion, the prejudice to ABC, and the inability for ABC to cure the deficiency, striking the Nelson Report represents the proper course of action for this Court to take.  Taking all the foregoing factors into account, striking the Nelson

Report constitutes appropriate relief under Rule 37(c)(1) to account for Plaintiffs' failure to comply with the Discovery Plan.

## CONCLUSION

For the reasons stated in ABC's supporting Memorandum, ABC respectfully request the Court to grant their Motion to Exclude the testimony and Report of Dr. Jon Nelson and award any further relief that this Court deems just and proper.

Respectfully submitted,


_____*/s/ Ryan S. Hardy*____
Tara Lynn R. Zurawski (VSB No. 73602)
Senior Assistant Attorney General
Ryan S. Hardy (VSB No. 78558)
Madeline M. Gibson (VSB No. 87561)
Megan K. Scanlon (VSB No. 88241)
Assistant Attorneys General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 786-0969
Facsimile:   (804) 692-2087
Email: tzurawski@oag.state.va.us
Email: mgibson@oag.state.va.us
Email: rhardy@oag.state.va.us
Email: mscanlon@oag.state.va.us

*Counsel for Defendants*


Mark R. Herring
Attorney General of Virginia

Stephen A. Cobb
Deputy Attorney General

Samuel T. Towell
Deputy Attorney General

## CERTIFICATE OF SERVICE

I certify that on this 11th  day of January, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that a Notice of Electronic Filing (NEF) was sent to all counsel of record.

*/s/ Ryan S. Hardy*
Madeline M. Gibson (VSB No. 78558)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone:  (804) 786-0969
Facsimile:   (804) 371-2087
Email: rhardy@oag.state.va.us

*Counsel for Defendants*